DARIUS L. VIGUS

*v.*

MATILDA O'BANNON.

*Filed at Springfield October 6, 1886.*

1. LIMITATION—*fraudulent concealment of cause of action, as affecting
the running of the statute.* If an agent to collect the amount of a life policy
of insurance, receives a sum of money largely in excess of that which he pays
over to his principal, a right of action will arise in favor of the latter to recover
the sum retained; and mere silence as to the collection of such excess, when
the principal has no knowledge of the fact, is a concealment of the cause

of action, and is perhaps a fraudulent concealment, within the meaning of section 22 of the Limitation act. But if the agent goes further, and makes affirmative statements which are untrue, and resorts to active measures to quiet any suspicions that his principal might have that he has not accounted for all he has collected, this will unquestionably show such fraudulent concealment.

2. SAME—*of the diligence required to discover the fraud—and of the relation of trust and confidence, as affecting the question of diligence.* The rule that in cases of fraud the Statute of Limitations begins to run only from the time of the discovery of the fraud, does not apply when the party affected by the fraud might, with ordinary diligence, have discovered it.

3. The failure to use ordinary diligence to discover the fraud may be excused where there exists some relation of trust and confidence, as, principal and agent, client and attorney, *cestui que trust* and trustee, between the party committing the fraud and the party who is affected by it, rendering it the duty of the former to disclose to the latter the true state of the transaction, and when it appears that it was through confidence in the party who committed the fraud that the other was prevented from discovering it.

4. In this case, the beneficiary in a life policy of insurance of $5000, after the death of the assured placed the same in the hands of a relative for collection. The latter went to Chicago, where the office of the insurance company was, and returned and reported to his principal that the company disputed its liability, and that he had settled the claim for $2000, not being able to collect more, and advised the principal to accept such sum in full, falsely stating that he saw evidence making his right to recover on the policy doubtful. The principal, relying on the truth of his agent's statements, accepted of the latter the $2000 in full, and made no examination to discover whether his agent's representations were true or false: *Held,* that if the agent, either before or at the time of making such statements, collected from the company on such claim an additional sum of $3000, and concealed that fact from the principal, the latter was not guilty of *laches* in relying on his agent's statements, and might collect the latter sum of his agent's estate, notwithstanding five years had elapsed from the time the agent received the money.

5. WITNESS—*competency of party—as against one defending as administrator.* In an action against an estate upon a cause of action which accrued more than five years before the commencement of the suit, in which it is claimed there was a fraudulent concealment of the facts, and that knowledge of the claimant's right came to him within the five years, he is a competent witness, under the first exception to section 2 of the statute relating to evidence, to state such facts occurring after the death of the intestate, having reference to his acquiring knowledge of his rights.

6. EVIDENCE—*degree and quality required.* The law does not require that a party shall produce all the evidence that may exist, or the strongest evidence, of any matter in dispute. The law only excludes such evidence as,

from the nature of the case, supposes there is other evidence, superior in grade or quality, in the power of the party to produce.

7. SAME—*degree of evidence to prove a negative.* Full or plenary proof, when a party has the burden of proving a negative, is never required. In such case, it is sufficient if he offers such evidence as, in the absence of all counter testimony, will render the existence of the negative probable, even though it may be vague.

8. So where it became necessary for a plaintiff to show that he had no notice or knowledge that the intestate whose estate he was seeking to make liable, had received a larger sum of money belonging to the plaintiff than he had accounted for, until within five years before filing his claim, it was *held,* that evidence of the manner in which the plaintiff learned the facts, and that he seemed greatly surprised on learning them, was proper and admissible.

9. SAME—*a receipt as evidence—and of its weight.* An agent's receipt for money belonging to his principal, when the signature thereto is shown to be in his handwriting, is evidence of a satisfactory character, against him or his estate, that he did receive the sum therein named; and to overcome the same, the testimony should be convincing, and the burden of proof to contradict such receipt rests upon the party disputing it.

10. SAME—*to show fraud—admissibility.* In the investigation of questions of fraud, the court should be liberal in the admission of evidence tending to disclose the true nature of the transaction. Circumstances apparently trivial in themselves, may, in connection with other facts, afford very strong evidence.

11. So where a person intrusted with the collection of a demand, reported to his principal his inability to collect the same, and that he had compromised the matter by accepting less than one-half, and to reconcile the principal to the pretended compromise, the agent told him he had seen certain letters of parties stating facts which, if true, would defeat the claim, and thereby induced the principal to settle with him, when, in fact, he had collected the entire demand, it was *held,* in an action by the principal against the agent's estate, to recover the balance of the money received by him, that it was error to refuse to allow the parties named by such agent, to testify that they had never written any such letters as those he pretended to have seen.

12. PROPOSITION OF LAW—*in the abstract.* The rule that an instruction is improper which is expressed in general or abstract terms, is applicable only when the trial is before a jury. The rule has no application in a trial by the court without a jury.

APPEAL from the Appellate Court for the Third District;— heard in that court on appeal from the Circuit Court of Montgomery county; the Hon. JESSE J. PHILLIPS, Judge, presiding.

Mr. GEORGE L. ZINK, and Mr. JAMES M. TRUITT, for the appellant:

The third proposition relates to the proof of the negative averment that appellant had no notice. In support of the proposition, see *Barnum* v. *Barnum,* 9 Conn. 242; *Lockhart* v. *Jones,* 9 R. I. 381; 1 Greenleaf on Evidence, sec. 82; 1 Halstead on Evidence, 156.

The principle announced in the sixth proposition is fully supported by *Winchester* v. *Grosvenor,* 44 Ill. 425, and *Rosenmueller* v. *Lampe,* 89 id. 212. See, also, *Gove* v. *Campbell,* 4 Bradw. 661.

As to cases requiring clear proof, or clear and satisfactory proof, see *Wilson* v. *McDowell,* 78 Ill. 514; *Blasey* v. *Delius,* 86 id. 558; *Tunison* v. *Chamblin,* 88 id. 378; *Sapp* v. *Phelps,* 92 id. 588; *Hancock* v. *Harper,* 86 id. 445; *Maher* v. *Farwell,* 97 id. 56; *Root* v. *Curtis,* 38 id. 192; *Eames* v. *Hartlin,* 111 id. 634; 1 Greenleaf on Evidence, sec. 2.

The rights of a principal as against the fraud of the agent are in some respects more sacredly guarded than are the rights of a client as against his attorney. Bigelow on Fraud, 222.

If the conduct of Mr. O'Bannon was not flagrantly fraudulent, we confess that we can not imagine how an agent can commit fraud against his principal. *Gerry* v. *Dunham,* 57 Me. 334; *Brickner* v. *Lightner's Exr.* 40 Pa. St. 199; *Way* v. *Cutting,* 20 N. H. 187; *Turnpike Corporation* v. *Field,* 3 Mass. 201; *Haynie* v. *Hall,* 5 Humph. 290; *Livermore* v. *Johnson,* 27 Miss. 284; *Findley* v. *Stewart,* 46 Iowa, 655.

The presumption is that appellant relied on the false statements of Mr. O'Bannon in relation to the collection of the money in controversy, and that it was not *laches* in appellant to rely on such false statements until he had reason to doubt the truthfulness of the same. *Halbrook* v. *Burt,* 22 Pick. 546; *Mead* v. *Bunn,* 32 N. Y. 275; *Partridge* v. *Usborne,* 5 Russ. 232; *Sankey* v. *Alexander,* L. R. 9 Irish Eq. 316; *Reynell* v. *Sprye,* 1 DeG., M. & G. 709; Benjamin on Sales, 386, note c,

and cases cited; Kerr on Fraud, 80, 81; Bigelow on Fraud, 67, note 3, and cases cited.

In order to excuse the use of proper diligence, there must exist some relation of trust and confidence, as, principal and agent, client and attorney, *cestui que trust* and trustee, between the party committing the fraud and the party who is affected by it, which rendered it the duty of the former to disclose to the latter the true state of the transaction, and showing that it was through confidence in the acts of the party who committed the fraud that the other was prevented from discovering it. *Buckner* v. *Colcote*, 28 Miss. 431; *Wilson* v. *Ivy*, 32 id. 233; *Harrisburg Bank* v. *Forster*, 8 Watts, 12; *National Bank* v. *Harris*, 118 Mass. 147; *Way* v. *Cutting*, 20 N. H. 287; *Wear* v. *Skinner*, 46 Md. 257; Bigelow on Fraud, 445.

Mr. R. McWILLIAMS, Mr. L. ALLEN, and Messrs. LANE & COOPER, for the appellee:

A slight error in the exclusion of evidence, which would not change the result, is no ground for reversal. *Hill* v. *Parsons*, 110 Ill. 108.

It is not error to refuse propositions of law which are mere abstract propositions, (*Wadhams* v. *Swan*, 109 Ill. 55,) or if the judgment is clearly proper, (*Railway Co.* v. *Lake View*, 105 Ill. 184,) or if they are inapplicable. *McCleary* v. *Menke*, 109 Ill. 103.

The concealment, to take a case out of the Statute of Limitations, means some positive, affirmative act of concealment, so that the plaintiff, by using diligence, could not have found out the truth. As to proof to take the case out of the statute, see *Cole* v. *McClathey*, 9 Me. 131; *McKown* v. *Whitmore*, 31 id. 448; *Penobscott* v. *Mays*, 65 id. 561; *Buckner* v. *Calcote*, 28 Miss. 592; *Kuhlman* v. *Baker*, 50 Texas, 630; *Breman* v. *McLean*, 45 id. 18; *Sweet* v. *Henting*, 24 Kan. 497; *Munson* v. *Hallancrell*, 26 Texas, 425; *Boyd* v. *Boyd*, 27 Ind. 429; *Robinson* v. *State*, 57 id. 113; *Sutton* v. *Dyr*, 60 Ga. 449;

*Freeman* v. *Cover*, 56 id. 161; *District, etc.* v. *Frend*, 40 Iowa, 601; *Foster* v. *Rison*, 17 Gratt. 322; *Finley* v. *Stewart*, 40 Iowa, 613; *Hauyne* v. *Hall*, Humph. 293; *Jones* v. *State*, 14 Ind. 120; *Blenthing* v. *Loveing*, 58 Me. 438; *Quigle* v. *Gould*, 91 Ill. 384; *Hayward* v. *Green*, 82 id. 389; *Beatty* v. *Nicholson*, 73 id. 605; *Campbell* v. *Vining*, 23 id. 530; *Wood* v. *Carpenter*, 11 Otto, 135; *Nudd* v. *Hamblin*, 8 Allen, 130.

Appellant had the means of knowledge of the supposed concealment, and this was equal to knowledge itself. *Wood* v. *Carpenter*, 101 U. S. 135; *Buckner* v. *Calcote*, 28 Miss. 596.

Mr. JUSTICE MAGRUDER delivered the opinion of the Court:

Richard W. O'Bannon died November 15, 1883. On June 30, 1884, a claim for $3000, and interest thereon from March 4, 1875, amounting to $4670, was filed against his estate, in the county court of Montgomery county, by Darius L. Vigus, the appellant in this cause. The claim was disallowed by the county court, and taken, by appeal, to the circuit court of that county, where the case was tried, by agreement, before the circuit judge, without a jury, and judgment rendered, in favor of the estate, disallowing the claim. Such judgment of the circuit court has been affirmed by the Appellate Court of the Third District, and appellant prosecutes his further appeal to this court.

On May 22, 1872, the Protection Life Insurance Company of Chicago issued a policy of insurance on the life of appellant's mother, Eliza Vigus, for the sum of $5000, payable to appellant. Eliza Vigus died on October 12, 1874, at Raymond, in Montgomery county, and the disease of which she died, according to the statements in the proofs of death, furnished to the company, was paralysis. In January, 1875, Richard W. O'Bannon went from Raymond to Chicago to collect the insurance money for appellant at the request of the latter, and as his agent, taking the policy with him. Upon

his return, in the same month, he paid to appellant $2000, stating that the company refused to pay any more, and that he had compromised the claim for that amount. It is charged by appellant, that O'Bannon collected the full sum of $5000, named in the policy, and failed to pay over $3000. To recover said sum of $3000 is the object of this proceeding. The claim of appellant, as sworn to and filed in the county court, alleges, that the collection of the $3000 "was by the said O'Bannon fraudulently concealed from the claimant, during the lifetime of the said O'Bannon."

Three questions of fact were presented for the determination of the trial court: First, did R. W. O'Bannon collect the $3000 in question from the insurance company? Second, did he fraudulently conceal the fact of such collection from the appellant? Third, did appellant file his claim in the county court, within five years, after he discovered, that the company had paid the $3000? As bearing upon these questions of fact, certain propositions of law were submitted to the circuit court upon the trial of the cause, and the action of that court, in reference to those propositions, is the only feature of the case, which it is proper for us to consider. *Hobbs* v. *Ferguson's Estate*, 100 Ill. 232; *Tibballs* v. *Libby*, 97 id. 557.

The circuit court refused to hold, as law, appellant's sixth proposition, which is as follows:

"The court holds that the receipt indorsed on the back of the policy of insurance in evidence in this case,—the signature to the same being admitted to be in the handwriting of the said O'Bannon,—is evidence of a satisfactory character that the said O'Bannon received the amount of money in said receipt specified, and that to do away with its force the testimony should be convincing, and the burden of proof to explain or contradict said receipt, rests on the defendant."

The receipt, here referred to, bears no date, and is as follows:

"Received of the Protection Life Insurance Company five thousand dollars, being the amount in full on the within policy.

D. VIGUS,

By R. W. O'Bannon."

It was indorsed upon the back of the policy, and was found among the records and files of the insurance company about November 20, 1883. The signature, "D. Vigus by R. W. O'Bannon," is admitted to be in the handwriting of R. W. O'Bannon.

The language of the sixth proposition is almost identical with the language, used by us in *Winchester* v. *Grosvenor*, 44 Ill. 425, and subsequently approved of in *Rosenmueller et al.* v. *Lampe*, 89 Ill. 212.

There are circumstances, developed by the testimony, which tend to substantiate the recital, contained in the receipt. W. J. Terpenny, the head book-keeper of the insurance company, swears, that there was collected of the policyholders, by assessment, the sum of $5000 to pay the Vigus loss. It is also proven and is not disputed, that, on March 4, 1875, the insurance company issued a check of that date for $3000, on account of the Vigus claim, payable to appellant, and drawn on the Fidelity Savings Bank and Safe Depository of Chicago, and that this check for $3000 was paid by that bank some time in June, 1875. It is not claimed or contended by anybody, that appellant ever received the $3000, so paid on the last named check. O'Bannon's business with the company in Chicago was transacted mainly with one A. W. Edwards, the secretary of the company, who was O'Bannon's friend. The evidence tends to show, that O'Bannon made a second visit to Chicago late in May or early in June. It is undisputed, that he removed, in the latter part of May or early in June, 1875, from Raymond, where he had been living, to Litchfield, distant about sixteen miles, where he built himself a house, costing some $4000 or $5000.

There are also circumstances, which tend to contradict the recital, contained in the receipt. It is not shown, by any positive testimony, except the language of the receipt, that the check for $3000 was delivered to O'Bannon, or that he received the money on it. The check itself can not be found among the records of the company. Edwards, the secretary, whose deposition was taken by appellee, and is a part of the record, can remember nothing about the payment or settlement of this particular claim. The body of the receipt, indorsed on the policy, with the exception of the amount, was written by Terpenny, who left a blank space for the amount to be inserted. The amount so inserted, to-wit: the words, "five thousand dollars," are in the handwriting of Edwards. The proof tends to show, that these words, written by Edwards, and the signature, written by O'Bannon, were written with the same ink and at the same time, but whether in January, or March, or June, 1875, does not appear. The person, who drew the money from the bank on the check for $3000, must have indorsed the name of appellant, who was the payee therein, upon the back of the check. If the indorsement was so made by Edwards, it was a forgery. If it was made by O'Bannon, he may have signed appellant's name, by himself as agent, upon the back of the check, in the same way, and under the same supposed authority, as he signed such name to the receipt. Appellee introduced certain expert testimony to show, that the word, "*five*," in the receipt, had the appearance of being changed from the word "*two*," while appellant introduced an exactly equal amount of expert testimony to show, that the word "*five*" was so written in the first place, and had never been changed from the word "*two*."

We have thus alluded to some of the circumstances, which tend to sustain, and some, which tend to contradict the receipt. It was, to be sure, the province of the trial court to decide upon the value of these circumstances, as evidence, and also to pass upon all the other facts in the case. But it

was, at the same time, the duty of that court to apply proper rules of law, in determining, what weight should be given to the receipt introduced, and what kind of proof should be required to overcome it, and what party should assume the burden of explaining or contradicting it. We are, therefore, of the opinion, that the circuit court erred in refusing to hold, as law, appellant's sixth proposition.

The circuit court also refused to hold, as law, the following propositions, numbered ten and twelve, which were submitted to it by appellant on the trial:

"The court holds, that if the evidence shows that a relation of trust and confidence existed between the claimant and the said O'Bannon, and that O'Bannon, as claimant's agent, collected from the Protection Life Insurance Company the full amount of a policy in said company for $5000, held by claimant; that when the said O'Bannon accounted with claimant for the amount collected, he concealed from the knowledge of the claimant that he had collected said sum of $5000, but, on the contrary, stated to claimant that said company disputed the justness of his claim, and refused to pay the same in full, and that he, the said O'Bannon, had not and could not collect from said company the full amount of said policy, and could only collect, and had only collected in a compromise with said company, the sum of $2000, and then and there advised the claimant to ratify and approve said compromise, and accept said sum of $2000 in full of claimant's said claim for $5000, which statements the claimant relied on, believing the same to be true, and that the claimant, so relying on said statements, and believing the same to be true, made no examination to discover whether said statements were true or false, but acted upon said advice and statements, and did then and there accept said sum of $2000 in full of claimant's said claim for $5000, then the court holds that said O'Bannon fraudulently concealed from the knowledge of the claimant the cause of action which existed in favor of claimant,

against said O'Bannon, to recover said $3000, and the Statute of Limitations did not commence running against said cause of action, so concealed, as aforesaid, until the claimant discovered, or might by reasonable diligence on his part have discovered, that such cause of action existed in his favor.

"The court holds, that if the evidence shows that a relation of trust and confidence existed between the claimant and the said R. W. O'Bannon, and that the said O'Bannon, as claimant's agent, went to Chicago to settle claimant's claim for a loss against the Protection Life Insurance Company, and that when the said O'Bannon returned from Chicago he reported to claimant that said insurance company disputed the justness of claimant's claim, and refused to pay the same in full, and that he, the said O'Bannon, had been able, by compromising said claim, to collect from said company the sum of $2000 in full of claimant's claim for $5000, but could not collect more, and then and there advised claimant to accept said sum of $2000 in full of his said claim ; and if the evidence shows that the claimant, relying on said statements and representations, and believing the same to be true, and by reason thereof made no examination to discover whether said statements were true or false, but acted upon the same as true, and ratified the compromise so reported by the said O'Bannon to have been by him effected, and then and there accepted said sum of $2000 in full of his claim against said company for $5000; and if the evidence further shows that the said O'Bannon, either before or after making said statements and representations, collected from said company on said claim an additional sum of $3000, and concealed such fact from the knowledge of the claimant, then the court holds that it was not *laches* for the claimant to rely on the representations and statements of the said O'Bannon, and accept and act upon them as true, and make no examination to discover whether they were true or false."

The 22d section of the Limitation law (Starr & Curtis' Stat. chap 83, p. 1558) of this State, is as follows: "If a person, liable to an action, fraudulently conceals the cause of such action from the knowledge of the person, entitled thereto, the action may be commenced at any time within five years after the person, entitled to bring the same, discovers, that he has such cause of action, and not afterwards." The propositions in question asked the court to hold, that certain facts, if found to exist, would constitute such a fraudulent concealment, as is contemplated by the statute. If O'Bannon collected the $3000, he was bound to pay it over at once, and a cause of action arose at once, in favor of appellant, to recover the amount so collected. Mere silence as to the fact of such collection would amount to concealment, and, perhaps, to fraudulent concealment. But if he went further than this, and made affirmative statements, which were untrue, and resorted to active measures to quiet any suspicions, that appellant might entertain, there was unquestionably a fraudulent concealment. He represented, that the company disputed the claim, and urged this fact, as a reason for settling for $2000. There is proof tending to show, that Mrs. Vigus had cancer, when the policy was taken out, but that the company had no knowledge of it, unless they received the letters, hereinafter mentioned. Three witnesses swear, that O'Bannon stated on his return from Chicago, that he saw, in the possession of the company, letters written by appellant's uncle, John Barrett, and by appellant's aunts, Mrs. Lea, Mrs. Burns and Mrs. Dibble, two of whom lived in Litchfield, and two in St. Louis, informing the company of the existence of cancer before the issuance of the policy. There is no dispute about the fact, that O'Bannon claimed to have seen these letters in Chicago. The information, that his uncle and aunts had written these letters estranged appellant from them, so that communication between him and them ceased. No such letters, upon search therefor, can be found among the records

and files of the insurance company. John Barrett, the uncle, swears, he once asked O'Bannon, after the latter moved to Litchfield, if he claimed to have seen such letters in the company's hands, and O'Bannon replied: "Sir, I never heard of such a thing."

These propositions also announce a correct rule, as to the degree of diligence, which appellant was required to exercise, under the facts of this case, in inquiring and examining for himself, as to the truth of O'Bannon's statements to him. The rule, that, in cases of fraud, the Statute of Limitations begins to run only from the time of the discovery of the fraud, will not apply, where the party, affected by the fraud, might, with ordinary diligence, have discovered it. But the failure to use such diligence may be excused, where there exists some relation of trust and confidence, as, principal and agent, client and attorney, *cestui que trust* and trustee, between the party committing the fraud and the party, who is affected by it, rendering it the duty of the former to disclose to the latter the true state of the transaction, and where it appears, that it was through confidence in the acts of the party, who committed the fraud, that the other was prevented from discovering it. *Atlantic National Bank* v. *Harris*, 118 Mass. 147; *Harrisburg Bank* v. *Forster*, 8 Watts, 12; *Wear* v. *Skinner*, 46 Md. 257; *Wilson* v. *Ivy*, 32 Miss. 233; *Buckner* v. *Calcote*, 28 id. 432; Bigelow on Fraud, 445. The proof tends to show, that, in January, 1875, appellant was only about twenty-two years old; that his sister had married a son of R. W. O'Bannon; that he had been "in the employ of O'Bannon a great deal," and "was almost raised up under the eye of Mr. O'Bannon;" that the Vigus and O'Bannon families had been intimate for years; that appellant had, for years, been closely associated with O'Bannon, and had regarded him, as a father, and respected and obeyed him, as such; that, at this time, O'Bannon and wife, and O'Bannon's son and wife, and appellant, all lived in the same house; that appellant was

with O'Bannon's son fifteen years or longer and until about December 25, 1877; that the $2000, brought by the elder O'Bannon from Chicago, were turned over to J. D. O'Bannon, appellant's brother-in-law, to buy an interest for appellant in said J. D. O'Bannon's store; that R. W. O'Bannon was about his son's store most of the time; that, in view of the relations thus existing, and the confidence, growing out of them, appellant surrendered the policy of insurance to R. W. O'Bannon, and appointed the latter his agent to go to Chicago and collect the insurance money.

We are of the opinion, that the tenth and twelfth propositions should have been held by the trial court to be the law. *Gerry* v. *Dunham,* 57 Me. 334; *Brickner* v. *Lightner's Exr.* 40 Pa. St. 199; *Way* v. *Cutting,* 20 N. H. 187; *First Massachusetts Turnpike Corporation* v. *Field,* 3 Mass. 201; *Livermore* v. *Johnson,* 27 Miss. 284; *Findley* v. *Stewart,* 46 Iowa. 655.

Appellant produced Mrs. Lea, Mrs. Burns and Mrs. Dibble upon the trial, and had them sworn, and offered to prove by them, that they had never, either singly or together, written the letters, which O'Bannon stated that they had written, and which, so written by them, he also stated that he had seen in Chicago. The court refused to allow them to testify. The exclusion of this offered testimony was excepted to by appellant, and is one of the errors assigned upon the record. We think the court erred in excluding it. If it had been admitted, it would have tended to show, that O'Bannon had told appellant a falsehood, in order to keep him from entertaining any suspicions, and in order to reconcile him to the compromise, that was alleged to have been made. The question was, whether there had been a fraudulent concealment. "In the investigation of a question of fraud, courts should be liberal in the receipt of evidence, tending to disclose the true nature of the transaction. Very slight circumstances, apparently trivial in themselves, when joined with other facts, may afford irrefragible proof of fraud." Bigelow on Fraud, 476.

We also think, that the trial court erred in refusing to hold, as law, the following proposition, marked No. 3, submitted by appellant upon the trial of the cause:

"The court holds that no rule of law requires all the evidence, or the strongest evidence of the matters in dispute, but only that is excluded which, from the nature of the case, supposes evidence superior in quality or grade behind, in the power of the party whose duty it is to produce the same,—— that is· to say, the party whose duty it is to prove a fact must produce the best evidence which, from the nature of the case, must be supposed to exist, of such fact, and to be within the control of the party."

There can be no doubt but that the doctrine, announced in this proposition, is correct, as an abstract principle of law. The first section of the proposition is almost a literal copy of the language of the court in *Barnum* v. *Barnum*, 9 Conn. 241. The second section is substantially the same as the rule laid down in 1 Halsted's Law of Evidence, 156.

The rule, that an instruction is improper, which is expressed in general and abstract terms, is applicable only where the trial takes place before a jury. The reason of the rule is, that such an instruction is apt to mislead the jury. No ground can exist for the enforcement of such a rule, where the trial is, as here, before the court. *Chicago and Alton Railroad Co.* v. *Utley*, 38 Ill. 410; *McNair* v. *Platt*, 46 id. 211.

The facts, to which the third proposition was intended to apply, were those bearing upon the question, whether appellant had begun his suit within five years, after the discovery of his cause of action. To require a party to show, that he had no notice of a particular fact, until within five years before filing his claim, is to require him to prove a negative. 1 Greenleaf on Evidence, sec. 78, says: "In those cases, in which the plaintiff grounds his right of action upon a negative allegation, and where, of course, the establishment of this negative is an essential element in his case, * * * it is

obvious, that plenary proof on the part of the affirmant can hardly be expected; and, therefore, it is considered sufficient, if he offer such evidence as, in the absence of counter testimony, would afford ground for presuming, that the allegation is true." In *Beardstown et al.* v. *Virginia et al.* 76 Ill. 34, we said: "Full and conclusive proof, however, where a party has the burden of proving a negative, is not required, but even vague proof, or such as renders the existence of the negative probable, is, in some cases, sufficient to change the burden to the other party."

The testimony tends to show, that, in November, 1883, after the death of R. W. O'Bannon, appellant went to Chicago to testify, in some suit, to which A. W. Edwards was a party; that he was there told by Terpenny, that the receipt on the back of the policy was for $5000, and seemed to be greatly surprised at the information; that he had never before talked with Terpenny on the subject; that he never saw the policy, on which the receipt was indorsed, after he gave it to O'Bannon, in January, 1875, until it was exhibited to him in Chicago in November, 1883, etc. Such testimony had a tendency to show, that appellant had no notice of the cause of action, until after the death of O'Bannon. When appellant offered himself as a witness upon this subject, the circuit court refused to allow him to testify, holding his evidence to be incompetent, under section 2 of chapter 51 of the Revised Statutes, entitled "Evidence and Depositions." Under the first exception to section 2, as set out in the statute, appellant should have been allowed to state such facts, having reference to the date of his receiving the notice in question, as occurred after the death of R. W. O'Bannon.

For the reasons, here stated, we are of the opinion, that the Appellate Court erred in affirming the judgment of the circuit court. The judgments of the Appellate and circuit courts are, therefore, reversed, and the cause is remanded to the circuit court.                    *Judgment reversed.*